

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Clarence James Rogers

,

**Plaintiff(s),**

**vs.**

I.D.O.C., I.D.O.C., Moore: Parole Agent

,

**Defendant(s).**

**RECEIVED**

MAY 2 6 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Case No.

**15-cv-04577**
**Judge Harry D. Leinenweber**
**Magistrate Judge Jeffrey T. Gilbert**

---

### COMPLAINT FOR VIOLATION OF CONSTITUTIONAL RIGHTS

*This form complaint is designed to help you, as a* **pro se** *plaintiff, state your case in a clear manner. Please read the directions and the numbered paragraphs carefully. Some paragraphs may not apply to you. You may cross out paragraphs that do not apply to you. All references to "plaintiff" and "defendant" are stated in the singular but will apply to more than one plaintiff or defendant if that is the nature of the case.*

1.  This is a claim for violation of plaintiff's civil rights as protected by the Constitution and laws of the United States under 42 U.S.C. §§ 1983, 1985, and 1986.

2.  The court has jurisdiction under 28 U.S.C. §§ 1343 and 1367.

3.  Plaintiff's full name is ___Clarence James Rogers___.

*If there are additional plaintiffs, fill in the above information as to the first-named plaintiff and complete the information for each additional plaintiff on an extra sheet.*

1

4.  Defendant, the Illinois Department of Corrections

    _____, is
    (name, badge number if known)

    ☒ an officer or official employed by the Illinois Department of Corrections
    _____;
    (department or agency of government)

    _____ or

    ☐ an individual not employed by a governmental entity.

*If there are additional defendants, fill in the above information as to the first-named defendant and complete the information for each additional defendant on an extra sheet.*

5.  The municipality, township or county under whose authority defendant officer or official

    acted is  the Illinois Department of Corrections          . As to plaintiff's federal

    constitutional claims, the municipality, township or county is a defendant only if

    custom or policy allegations are made at paragraph 7 below.

6.  On or about_____9/15/14_____, at approximately _____1:00_____ ☒ a.m. ☐ p.m.
                (month,day, year)

    plaintiff was present in the municipality (or unincorporated area) of _____

    _____ , in the County of ____Cook_____,

    State of Illinois, at  7528 S. Eggleston/ Chicago, IL 60602
    _____,
                    (identify location as precisely as possible)

    when defendant violated plaintiff's civil rights as follows *(Place X in each box that applies)*:

    ☐   arrested or seized plaintiff without probable cause to believe that plaintiff had committed, was committing or was about to commit a crime;
    ☐   searched plaintiff or his property without a warrant and without reasonable cause;
    ☐   used excessive force upon plaintiff;
    ☐   failed to intervene to protect plaintiff from violation of plaintiff's civil rights by one or more other defendants;
    ☐   failed to provide plaintiff with needed medical care;
    ☐   conspired together to violate one or more of plaintiff's civil rights;
    ☐   Other:

    _____

    _____

Page 2; question 4(continued) Rogers V. IDOC

4.) Defendant, <u>Moore; Parole Agent,</u> is an officer employed by the Illinois Department of Corrections.

*Complaint continued Pg 4 #10*

2.) The plaintiff was paroled to "Hardin House," on September 5, 2014; located at 7528 South Eggleston/Chicago, 60620. Plaintiff was under the jurisdiction of defendant Moore. The plaintiff was required to complete six months of "House Arrest," mental health counseling, and substance abuse counseling, in compliance with the Prison Review Board's Parole and Mandatory Supervised Release Agreement with the plaintiff.

3.) The plaintiff complained about bed bugs for days to staff. Plaintiff requested emergency scheduled movement from the defendants, prior to seeking medical treatment for bed bug bites. Movement was granted. When the plaintiff returned at around midnight, the plaintiff was told that "He had to go." That was the only reason given. The plaintiff called the defendants. The telephone service operator/agent, asked the assistant house manager, ""Why are you kicking Mr. Rogers out?" The assistant manager just kept stating, "They say he gotta go," over and over again. The plaintiff's personal property had been packed and sitting in the foyer before he arrived.

4.) The defendants ordered the plaintiff to comply with the manager's orders. "So, you're just kicking Mr. Rogers out for nothing?" the agent asked the house manager.

5.) "They say, he gotta go," Was the only reply.

6.) The defendants then, instructed the plaintiff to report to the nearest police station, and report back to them and follow their orders to the letter. The plaintiff did, and as a result, the plaintiff catapulted into a State-imposed danger, that the defendants are responsible for creating. The defendants created the danger, increased the danger, and increased the plaintiff's vulnerability to the danger.

7.) Based upon information and belief, the order to have the plaintiff put out, came from Nancy Hardin and John Doe #1, an unknown, older black male, who could be the common-law husband of Nancy Hardin's. These individuals are the operators of Drexel Counseling Services; an organization which is in a symbiotic relationship with the defendants. These two individuals, who are not defendants, were responsible for substantially contributing to the creation of the health-endangering situation, which led to the plaintiff's injuries, and hospitalization. But for the affirmative acts of these two individuals, Nancy Hardin and John Doe #1, who gave the order to have the plaintiff kicked out into the streets because of his constant complaining about bed bugs, the plaintiff would not have been in the position to be injured in the first place. And although, these two individuals for Drexel Counseling Services, are eligible for liability under Section 1983, by virtue of their symbiotic relationship with the defendants, and their actions under the "Color of Law," they are not defendants at this point. Taking in to consideration, the unconstitutional application of a constitutional policy by inadequately trained agents for the defendants, the right circumstances fell into place and the inevitable became reality.

8.) "You shall follow any specific instructions provided by a parole agent that are consistent with furthering the conditions set and approved by the Prisoner Review Board or by law, exclusive of placement on electronic detention, to achieve the goals and objectives of your parole or mandatory supervised release, or to protect the public. These instructions by the parole agent may be modified at any time as the agent deems appropriate; and

9.) You shall also comply with any additional conditions of the Prison Review Board, including but not limited to: Substance Abuse Program; Electronic Detention (six months); and submit yourself to outpatient care as prescribed by a mental health clinic." This Reporting Instruction was given to the plaintiff by the defendants in his Parole or Mandatory Supervised Release Agreement; see page one of the plaintiff's exhibit number one.

10.) The plaintiff complied with every single order that the defendants gave him, and wound-up having to dial "911" on himself and to report his agent for the inhumane actions that she, (defendant Moore), displayed towards the plaintiff. The "911" Operator thought the plaintiff was a Cook County Correctional Department Charge, and were trying to pinpoint the plaintiff's location to lock him up.

11.) Plaintiff made this call approximately on September 16th at around 2:00 am in the morning, as he wandered around the streets wondering where he was gonna sleep, after being recently released from prison after five years.

12.) The defendants violated their own policies and Agreement. They protected no one. Their greatest obligation to protect was to the tax-payers of the State of Illinois, and they failed in that duty; however, for purposes of this action, the defendants had an affirmative duty to protect the plaintiff from harm, and, in this, they also failed. The defendants created the very circumstances that lead to the plaintiff being injured.

13. The Pacific Garden Mission where the plaintiff was sent to, by the defendants severed their symbiotic relationship with the defendants because of the many difficulties that the relationship posed for them, and parole agents setting up shop there, also. The defendants knew very well that the plaintiff would be exposed to a substantial risk of harm before they gave the order to the plaintiff to go there. Had the telephone service agents for the defendants been properly trained in the proper safety principles, practices and procedures, concerning seriously mentally ill parolees in their custody, this tragedy could have been avoided.

14.) Defendant Moore never showed an interest in the plaintiff's mandatory mental health and substance abuse treatment, from the first face-to-face meeting between the plaintiff and defendant Moore.

15.) Defendant Moore granted the plaintiff's request to live with his son, in Harvey, IL after the plaintiff was picked up by his youngest son just moments before the plaintiff was about to walk through the Emergency Room doors of Chicago's St. Luke Presbyterian Hospital, and check himself in for severe mental and emotion anguish and distress. This was the very first incident where the plaintiff was homeless; on or around September 15th of 2014.

16.) The plaintiff lived with his youngest son, Tywuan Javell Rogers and his grandson, Tywuan Jr. for about two weeks and the "Dog Law" disqualified the plaintiff from living there; a legit loss of host site. However, the second round of the plaintiff's homelessness begins. The plaintiff was automatically transferred back into defendant Moore's jurisdiction. It was during this span of time, that the deliberately indifferent statement was made by defendant Moore. The second time the plaint was left homeless was the longest. Plaintiff remained on the street for approximately 3-4 days. Exact dates and times are not exactly clear to the plaintiff because of the trauma her suffered.

17.) Defendant Moore did in fact make a statement to the plaintiff while he was still living in the house in Harvey, and searching vigorously for a place to stay; defendant Moore, based upon information and belief, learned that the plaintiff would be returned to her jurisdiction, and defendant Moore stated to the plaintiff in a telephone conversation; "Well, I'm just gonna call in, and tell them 'You aint gonna git rid of the dogs.'" The plaintiff continued to live in his son's house long after he had been told that he was not allowed to. It was only when the agents threatened to issue a warrant for the plaintiff's arrest, if he didn't leave the premises, that the plaintiff packed up all of his personal property and left out the door.

18.) Defendant Moore's motives towards the plaintiff were tainted.

19.) The order to the plaintiff to go to the police station, only to wind up being denied entry to a homeless shelter, that the defendants knew that the plaintiff would wind up in, constitutes the policy of the Illinois Dept. of Corrections. The plaintiff wound up back on the streets, with no resources, in downtown Chicago, and nowhere to go. And the constitutional policy was the moving- force that lead to the violation of the plaintiff's rights as a matter of law, because it was unconstitutionally applied.

20.) The defendants have a long-standing custom of, placing the burden of finding suitable housing on the shoulders of seriously mentally ill parolees, still in their physical custody. It's one thing, when you don't do anything to assist a person, especially one with special needs, but it's another when you actually initiate certain acts into motion, that assists that person in returning to prison. The defendants engaged in certain affirmative acts which can be construed by a reasonable fact-finder, as setting parolees up to fail; especially seriously mentally ill parolees, in physical custody.

21.) It could even be construed by a reasonable fact-finder that, the defendants even intruded upon the plaintiff's "bodily integrity."

22. Defendant Moore did not get involved in the plaintiff's mental health aftercare, or become concerned about the plaintiff's safety and wellbeing, until the plaintiff reported in to the defendants, that he was admitted to the hospital. It was days after the plaintiff fell off the radar. By this time, THRESHOLDS organization had to call defendant Moore's supervisor and make the defendants aware of the plaintiff's special needs, and defendant Moore's obligation to provide safety for the plaintiff and to secure him suitable housing. "I don't do that." Defendant Moore stated to the plaintiff the exact same words during another phone conversation, that he stated to THRESHOLDS staff members. See "Staff Intervention." Clinician: Grant Barlow.

23) "You shall follow any specific instructions provided by a parole agent that are consistent with furthering the conditions set and approved by the Prisoner Review Board or by law, exclusive of placement on electronic detention, to achieve the goals and objectives of your parole or mandatory supervised release, or to protect the public. These instructions by the parole agent may be modified at any time as the agent deems appropriate; and

24) You shall also comply with any additional conditions of the Prison Review Board, including but not limited to: Substance Abuse Program; Electronic Detention (six months); and submit yourself to outpatient care as prescribed by a mental health clinic." This Reporting Instruction was given to the plaintiff by the defendants in his Parole or Mandatory Supervised Release Agreement; see page one of the plaintiff's exhibit number one.

25. The plaintiff complied with every single order that the defendants gave him, and wound-up having to dial "911" on himself and to report his agent for the inhumane actions that she, (defendant Moore), displayed towards the plaintiff. The " 911" Operator thought the plaintiff was a Cook County Correctional Department Charge, and were trying to pinpoint the plaintiff's location to lock him up.

26) Plaintiff made this call approximately on September 16th at around 2:00 am in the morning, as he wandered around the streets wondering where he was gonna sleep, after being recently released from prison after five years.

27. The defendants violated their own policies and Agreement. They protected no one. Their greatest obligation to protect was to the tax-payers of the State of Illinois, and they failed in that duty; however, for purposes of this action, the defendants had an affirmative duty to protect the plaintiff from harm, and, in this, they also failed. The defendants created the very circumstances that lead to the plaintiff being injured.

28. The Pacific Garden Mission where the plaintiff was sent to, by the defendants severed their symbiotic relationship with the defendants because of the many difficulties that the relationship posed for them, and parole agents setting up shop there, also. The defendants knew very well that the plaintiff would be exposed to a substantial risk of harm before they gave the order to the plaintiff to go there. Had the telephone service agents for the defendants been properly trained in the proper safety principles, practices and procedures, concerning seriously mentally ill parolees in their custody, this tragedy could have been avoided.

29. The charged-entity defendants placed the plaintiff on a six-hour check-in status of some sort. This required the plaintiff to call in to the defendants and give his exact, physical location and street address to the nearest intersection. This order, to the plaintiff, represents "policy" and as applied, violated the plaintiff's federally protected rights. The defendant's telephone agents have not been adequately trained in the proper safety principles, practices, and procedures concerning the monitoring and management of seriously mentally ill parolees, who are in the physical custody of the defendants. The tasks that these individuals have to perform when coming into contact with seriously mentally ill parolees, who are still in the physical custody of the defendants, is not in the same vein, as the defendant's affirmative duty to protect the public, first and foremost; forget the plaintiff for the moment. Above their duty to protect the plaintiff, is the defendant's weightier duty to protect the public from harm at the hands of committed persons, parolees, etc. This particular action is about the unconstitutional actions of the defendants against the plaintiff, and the justice due him. However, one has to appreciate the gravity of the defendant's responsibility and their reckless disregard to fulfill their duty to the citizens of the State of Illinois; of which, the plaintiff was, also, at the time of this action.

30. The order to send the plaintiff to the nearest police station, after he lost his Parole Host Sites on two separate occasions, served as the moving force that lead to the plaintiff's injuries. No homeless shelter would accept the plaintiff into their facility, because of the plaintiff's special custodial status with the defendants. However, the charged-entity defendants ordered the plaintiff to report to the Chicago Police Department and check-in with them when he arrived. The defendants conveyed to the plaintiff, that the police would allow him to use their landline phone to call Catholic Charities, who would take the plaintiff to suitable housing. Catholic Charities, did in fact, pick the plaintiff up after several hours and dropped the plaintiff off at Pacific Garden Mission, where, he, the plaintiff, was denied entry due to his "house arrest" status. The plaintiff wandered around for days, homeless, cold, hungry, deeply depressed, suicidal, homicidal, etc. sleeping in the park with all of the "electronic monitoring" equipment, that the defendants had personally assigned to him. See documents: Registration numbers for "house arrest" equipment.

31. The charged-entity defendants failed to train its telephone service operators, (parole agents), and this reckless disregard for the safety of seriously mentally ill parolees, who are still in the physical custody of the defendants, amounts to deliberate indifference to the health and safety of these individuals with special needs. The defendants failed to train their agents concerning the sensitivity of their Constitutional obligation to protect those, with whom they come into contact with, and their heightened duty to provide for their safety; regardless of their disability, mental and/or emotional status. Out of all of the telephone service operators who worked as agents for the defendants, that the plaintiff came into contact with, while he was homeless, none of these individuals knew what to do; they were "stuck." The plaintiff had to make many of them aware of the six-hour check-in status that he had been placed on. None of these individuals, phone agents for the defendants recognized, that the plaintiff had special needs; a status of seriously mentally ill, and a chronic history of substance abuse, etc.

32.) Based upon information and belief: Agent Fort, the plaintiff's current agent, displays outstanding leadership qualities that should be encouraged and exemplified throughout the entire Department of Corrections.

Page 2; question 4(continued) Rogers V. IDOC

4.) Defendant, Moore; Parole Agent, is an officer employed by the Illinois Department of Corrections.

33.) Some of the statements from the phone operators, under the employ of the charged-entity defendant, to the plaintiff, at the time when he was homeless, crossed the line between negligence and deliberate indifference to the plaintiff's health and safety. The plaintiff talked with at least ten to fourteen telephone service agents within the span of time that he was left "ass out!" by the defendants. Because of the plaintiff's seriously mentally ill status, he is overwhelmed with the task of trying to litigate this action as a pro se plaintiff.

34.) Plaintiff has a great deal more evidence and documents to support his claim, yet, is not sure how to proceed without risking or damaging, what he believes to be, a prima facie case.

35.) The telephone service operators for the defendants did not know what to do with a particular situation like the plaintiff's, because they had never been properly trained in the proper principles, practices, processes, and procedures concerning the safety, monitoring and management of seriously mentally ill parolees in physical custody. Because their employers don't care. And this is the prevailing sentiment throughout the Illinois Dept. of Corrections; but this is about the parole division and the unconstitutional application of a constitutional policy, which violated the plaintiff's rights specifically. Again, empty prisons do not generate revenue. It makes perfect sense to the defendants to make money off of a seriously ill individual, by being deliberately indifference to his or her health and safety and filling up the prisons with them; as opposed to paying the parolee's rent in a halfway, who is on house arrest, and having to be his parole officer, baby sitter, Psychiatrist, Psychologist, substance abuse counselor, etc.;

36.) The charged-entity defendant failed to train its agents in a relevant respect to the tasks that they have to perform concerning the safety of seriously mentally ill parolees, in physical custody.

37.) The defendants also deprived the plaintiff of his liberty and safety, without fair procedure or due process of law. The plaintiff's freedom to act on his own was severely restricted by the defendants, because of the "Makeshift Psychological Prison Cell" that the defendants constructed, with materials made of threats of false imprisonment, intimidating remarks, coercion and strong hints of issuing a warrant for the plaintiff's arrest. The defendants were limiting the plaintiff's ability to protect himself, and to act on his on accord because of all the pressure that they were placing on the plaintiff to do their affirmative duty for them. In the process of instructing the plaintiff on where to go, and what to do, the telephone service agents were doing more damage than good. They were making the plaintiff more vulnerable to the danger, than he would have otherwise been. Plaintiff wound up in a much worse position with each new order and instruction by the defendants.

38. The inadequacy in the training of the defendant's agents was obvious and the need for more or different training was also apparent; however, the defendants made a conscious, intentional decision to turn a blind eye, and a deaf ear to the need, and this amounts to deliberate indifference to the plaintiff's health and safety. As a result of the defendant's reckless disregard for the plaintiff's safety, the plaintiff suffered tremendously. This should have never happened. The defendants allowed a seriously mentally ill, parolee, who was in their charge, under their jurisdiction, and, in their physical custody, to be left homeless, and wandering around the streets of the Chicago-land area; not once, but twice.

39. The mistakes that the telephone operators made concerning the management and monitoring of the plaintiff, reflects a deficiency and inadequacy in the training program; the training program failed to provide the proper safety principles, practices, processes, and procedures, outlining the course to follow in a particular situation like the plaintiff was in. The training program was not relevant to the tasks that theses (telephone agents), employees had to perform, considering they are constantly in contact with hundreds of parolees at any given time. Yet, these employees, themselves, did whatever they wanted to do; because there were no clear-cut guidelines or specific directives instructing them what to do. So, many of these employees substantially contributed to the health-endangering situation that lead to the plaintiff's injuries and hospitalization.

40. Many of these employees made statements to the plaintiff that created an atmosphere of intimidation, coercion, threatening remarks, and the powerful impression, that the plaintiff was on some sort of clock, and his time was running out. "You need to be trying to get somewhere, Mr. Rogers," and stronger statements, many of which, the plaintiff cannot remember. However, if provided with competent legal representation by the Court, the plaintiff can obtain the phone records of these conversations; if and when, this action reaches the "Discovery" phase. There are also complex medical and legal questions that the plaintiff is not qualified to address.

41. Much of the time that the plaintiff was left out in the streets by the defendants became a painful blur.

42. However, the deficiency in the training of these telephone agents is closely related to the plaintiff's constitutional harm. The failure of these phone agents to recognize the plaintiff's special needs, does not fall on them; it falls on the Illinois Dept. of Corrections. There should have been something in front of these service representatives, that signified a small "Red Flag" of some sort, to indicate that the particular parolee, with which the agent is in contact with, at that particular moment, is diagnosed as seriously mentally ill, and is on "House Arrest," and therefore, in physical custody, has a chronic history of violence, substance abuse, etc. Or, "This parolee has special needs, and in this event, contact parolee's assigned agent or the Placement Resource Unit, immediately. This simple phone call would have circumvented this tragedy. But the information was not provided for these agents, because of the callous disregard for the health and safety of seriously mentally ill parolees, in physical custody, by their employer. And because of this failure on the part of I.D.O.C., the unconstitutional application of a constitutional policy, concerning the safety of seriously mentally ill, parolees, in physical custody, comes into fruition.

43) Based upon information and belief, personal experience, and reasonable inferences, there exists between four and six additional defendants, in the persons of telephone service operators under the employ of the I.D.O.C., who, while acting under the color of state law, demonstrated deliberate indifference to the plaintiff's health and safety in the statements that these individuals made to the plaintiff, during phone conversations. These possible defendants, agents for the defendants in this specific action, made statements to the plaintiff like: "You need to find somewhere to live Mr. Rogers." "You need to get somewhere and get stabilized (meaning, somewhere, where he, the plaintiff, could plug up his house arrest equipment and this way, the defendants would be able to monitor him better.

44) The defendants violently shifted their affirmative duty to protect the plaintiff to the plaintiff; the Chicago Police Department; Catholic Charities; Cook County Health and Hospital Systems; Norwegian American Hospital; THRESHOLDS, etc. The defendants were well aware of the need to provide proper training for its agents, but were deliberately indifferent to the need.

45) Based upon information and belief, personal experience and reasonable inferences, "Empty prisons do not generate revenue."

46) The charged-entity defendants have practiced a long-standing custom of placing seriously mentally ill parolees in their physical custody, in crisis situations, in which these individuals are neither equipped nor prepared to deal with. The defendants have allowed seriously mentally ill parolees who are in their physical custody, to be kicked out of halfway houses, recovery homes, rehabilitation centers, etc., into crisis situations, in which they are neither equipped to deal with, nor prepared to mentally and/or emotionally overcome, while in the process of trying to make their transition back into the community.

47) The plaintiff's criminal history and track record supplies and suggests, that he will more than likely, fail; whether it be returning to prison or whatever. The defendants have practiced a long-standing custom of recklessly disregarding seriously mentally ill parolees in physical custody, by virtue of a house arrest band, global positioning system, etc. The defendants took advantage of the plaintiff's mental vulnerabilities, and dehumanized the plaintiff to the level of an "electronic wire transfer" of some monetary value. The phone agents for the defendants pushed the plaintiff around on the dangerous streets of the Chicago land area with threats of a warrant being issued for his, (the plaintiff's), arrest, if he did not find some place to stay soon. Intimidating tactics, and threatening hints, that the plaintiff was running out of time. The thought of being thrown back into a prison cell for nothing terrified the plaintiff.

48) Plaintiff was prepared to accept death as opposed to being put back through that shameful, painful experience; especially for something that he didn't do. Plaintiff had been waiting five years to be released. The defendants failed to do their affirmative duty and as a result, the plaintiff was severely injured.

49) Plaintiff is more likely to save a life, as opposed to taking one; only by the grace of God.

50.) Some of the statements from the phone operators, under the employ of the charged-entity defendant, to the plaintiff, at the time when he was homeless, crossed the line between negligence and deliberate indifference to the plaintiff's health and safety. The plaintiff talked with at least ten to fourteen telephone service agents within the span of time that he was left "ass out!" by the defendants. Because of the plaintiff's seriously mentally ill status, he is overwhelmed with the task of trying to litigate this action as a pro se plaintiff.

51.) Plaintiff has a great deal more evidence and documents to support his claim, yet, is not sure how to proceed without risking or damaging, what he believes to be, a prima facie case.

52.) The telephone service operators for the defendants did not know what to do with a particular situation like the plaintiff's, because they had never been properly trained in the proper principles, practices, processes, and procedures concerning the safety, monitoring and management of seriously mentally ill parolees in physical custody. Because their employers don't care. And this is the prevailing sentiment throughout the Illinois Dept. of Corrections; but this is about the parole division and the unconstitutional application of a constitutional policy, which violated the plaintiff's rights specifically. Again, empty prisons do not generate revenue. It makes perfect sense to the defendants to make money off of a seriously ill individual, by being deliberately indifference to his or her health and safety and filling up the prisons with them; as opposed to paying the parolee's rent in a halfway, who is on house arrest, and having to be his parole officer, baby sitter, Psychiatrist, Psychologist, substance abuse counselor, etc.;

53.) The charged-entity defendant failed to train its agents in a relevant respect to the tasks that they have to perform concerning the safety of seriously mentally ill parolees, in physical custody.

54.) The defendants also deprived the plaintiff of his liberty and safety, without fair procedure or due process of law. The plaintiff's freedom to act on his own was severely restricted by the defendants, because of the "Makeshift Psychological Prison Cell" that the defendants constructed, with materials made of threats of false imprisonment, intimidating remarks, coercion and strong hints of issuing a warrant for the plaintiff's arrest. The defendants were limiting the plaintiff's ability to protect himself, and to act on his on accord because of all the pressure that they were placing on the plaintiff to do their affirmative duty for them. In the process of instructing the plaintiff on where to go, and what to do, the telephone service agents were doing more damage than good. They were making the plaintiff more vulnerable to the danger, than he would have otherwise been. Plaintiff wound up in a much worse position with each new order and instruction by the defendants.

55.) The order to the plaintiff to go to the police station, only to wind up being denied entry to a homeless shelter, that the defendants knew that the plaintiff would wind up in, constitutes the policy of the Illinois Dept. of Corrections. The plaintiff wound up back on the streets, with no resources, in downtown Chicago, and nowhere to go. And the constitutional policy was the moving- force that lead to the violation of the plaintiff's rights as a matter of law, because it was unconstitutionally applied.

56.) The defendants have a long-standing custom of, placing the burden of finding suitable housing on the shoulders of seriously mentally ill parolees, still in their physical custody. It's one thing, when you don't do anything to assist a person, especially one with special needs, but it's another when you actually initiate certain acts into motion, that assists that person in returning to prison. The defendants engaged in certain affirmative acts which can be construed by a reasonable fact-finder, as setting parolees up to fail; especially seriously mentally ill parolees, in physical custody.

57.) It could even be construed by a reasonable fact-finder that, the defendants even intruded upon the plaintiff's "bodily integrity."

58.) Plaintiff is a member of THRESHOLDS; an organization that is dedicated to helping individuals with disabilities, to overcome obstacles that prevent them from living a quality life. THRESHOLDS stepped in when the defendants left the plaintiff "Ass out!" and went to bat in a huge way, in terms of providing the safety that the plaintiff needed. The plaintiff was not capable of protecting himself, and had it not been for THRESHOLDS calling the defendants, and reminding them of their heightened duty and obligation to the plaintiff, there is no telling when, if ever, the defendants would have did their job. See THRESHOLDS' documents: six (6), in all.

59.) "(Parole officer reported that she never gave referrals and that she could contact PRG (Placement Resource Group), to have member (plaintiff), placed elsewhere. Staff and parole officer linked member to Printiss House on West 112th place for his Monday discharge..." See THRESHOLD'S document, "Staff Intervention.

60.) All of the above events transpired after the plaintiff suffered from severe mental and emotional injuries. Defendant Moore had not been involved in the plaintiff's case at all. What she had failed to realize, was Printis House was also under Drexel Counseling Services, and the sister-house of Hardin House. Nancy Hardin had already kicked the plaintiff out of her recovery home. That's why they are saying that there was a miscommunication; see THRESHOLD'S NOTE 1. When Nancy Hardin found out that the "New guy" was the plaintiff, she rejected defendant Moore's attempt to place the plaintiff back in her area of operation; in her relationship with Drexel Counseling Services, she places a great deal of her parolees there. The plaintiff conveyed to THRESHOLDS' staff, that they did not want him there at Printis, before they made the move. Defendant Moore had the same opportunity and choice to call the PRG for the plaintiff at that time, just as she had it before the plaintiff was injured.

61.) Defendant Moore was attempting to clean up her mess. She had been dealing with the plaintiff with tainted motives from the outset. It could even be construed by a reasonable fact-finder, that defendant Moore acted with a level of malice.

62.) The therapeutic value of THRESHOLDS' organization, and all of the organizations which are affiliated with them, is immeasurable. Thresholds has treated the plaintiff with no less than, courtesy, consideration, dignity and respect. More funding should be poured into organizations, such as Thresholds, as opposed to cutting. Plaintiff has hard evidence and desired results, that people who suffer from disabilities can recovery with help from people who care. Plaintiff has a long-term care Psychiatrist: Dr. Elam

63. Based upon information and belief: Agent Fort, the plaintiff's current agent, displays outstanding leadership qualities that should be encouraged and exemplified throughout the entire Department of Corrections.

14. Plaintiff also claims violation of rights that may be protected by the laws of Illinois, such as false arrest, assault, battery, false imprisonment, malicious prosecution, conspiracy, and/or any other claim that may be supported by the allegations of this complaint.

**WHEREFORE,** plaintiff asks for the following relief:

A. Damages to compensate for all bodily harm, emotional harm, pain and suffering, loss of income, loss of enjoyment of life, property damage and any other injuries inflicted by defendant;

B. ☒ *(Place X in box if you are seeking punitive damages.)* Punitive damages against the individual defendant; and

C. Such injunctive, declaratory, or other relief as may be appropriate, including attorney's fees and reasonable expenses as authorized by 42 U.S.C. § 1988.

Plaintiff's signature: _____

Plaintiff's name *(print clearly or type)*:____Clarence Rogers_____

Plaintiff's mailing address:_____1458 S. Canal (Pacific Garden Mission)____

City____Chicago_____ State ___IL___ ZIP ____60607____

Plaintiff's telephone number: ( 773 ) _837_ _9277_____.

Plaintiff's email address *(if you prefer to be contacted by email)*:___clarencerogers626@____ Yahoo.com_____

15. Plaintiff has previously filed a case in this district. ☐ Yes ☒ No

    *If yes, please list the cases below.*

*Any additional plaintiffs must sign the complaint and provide the same information as the first plaintiff. An additional signature page may be added.*

_____ .

7.    Defendant officer or official acted pursuant to a custom or policy of defendant

      municipality, county or township, which custom or policy is the following: (***Leave blank***

      ***if no custom or policy is alleged***): the policy concerning the safety of seriously mentally

      ill parolees, still in the physical custody of the defendants, by virtue of "Electronic

      Monitoring," or some other form of personal restraint, while constitutional; is being

      unconstitutionally applied; and, as a result, the plaintiff was seriously injured.

8.    Plaintiff was charged with one or more crimes, specifically:

      _____

      _____

      _____

      _____

      _____

9.    (***Place an X in the box that applies. If none applies, you may describe the criminal***
      ***proceedings under "Other"***) The criminal proceedings

      ☐  are still pending.

      ☐  were terminated in favor of plaintiff in a manner indicating plaintiff was innocent.[1]

      ☐  Plaintiff was found guilty of one or more charges because defendant deprived me of a

      fair trial as follows_____

      _____ .

      ☐  Other: _____ .

      _____

[1]Examples of termination in favor of the plaintiff in a manner indicating plaintiff was innocent
may include a judgment of not guilty, reversal of a conviction on direct appeal, expungement of the
conviction, a voluntary dismissal (SOL) by the prosecutor, or a *nolle prosequi* order.

10.     Plaintiff further alleges as follows: (*Describe what happened that you believe supports your claims. To the extent possible, be specific as to your own actions and the actions of each defendant.*)

Defendant Moore stated to the plaintiff during a telephone conversation, "I'm not gonna find you no place to stay! You have to do that; you found the last place." This was in response to the plaintiff requesting defendant Moore's help in finding a place to live. The plaintiff has special needs and defendant Moore had an affirmative duty to provide safety for the plaintiff, and failed to do this. This statement demonstrates deliberate indifference to the plaintiff's health and this is in direct contravention the the plaintiff's federally protected rights under the United States Constitution. The affirmative acts of defendant Moore, substantially contributed to the creation of a health-endangering situation, which lead to the injuries for severe mental and emotional trauma and exposure to freezing temperatures, and hospitalization. Defendant Moore acted with the intent to cause the plaintiff harm. Defendant Moore used her power and authority, as a State official to create an opportunity, that would not have existed otherwise, for the plaintiff to be injured. Defendant Moore, also made statements to the plaintiff that constitute deliberate indifference to the plaintiff's health and safety; these statements were made during telephone conversations between the plaintiff and defendant Moore, as the plaintiff wandered around the streets of the Chicago-land area for - .

11.    Defendant acted knowingly, intentionally, willfully and maliciously.

12.    As a result of defendant's conduct, plaintiff was injured as follows:

severe mental anguish, emotional distress, extreme physical pain from being exposed to freezing temper-atures, and sleeping in the wet grass in the park without the proper winter attire. Plaintiff suffered from severe depression, suicidal ideation, extreme anxiety, and terror, from the defendant's pressure on the plain-tiff to find himself a place to stay.

13.    Plaintiff asks that the case be tried by a jury.    ☒ Yes      ☐ No

4

In support of plaintiff's complaint, the plaintiff submits the following documents to the Court:

1.) Plaintiff's Reporting Instructions(one page).
2.) Parole or Mandatory Supervised Release Agreement(three pages).
3.) Electronic Detention Program Agreement/Terms and Conditions of the Electronic Detention Program(two pages).
4.) Notice of Rights/Revocation Hearing(two pages).
5.) Project Safe Neighborhood's Notification Letter/Possession of Dogs by a Felon Notification(two pages).
6.) Hand-written, original copy of the "House Arrest" equipment's registration number, that was personally assigned to the plaintiff by the defendants. And other identifying information(one page).
7.) Cook County Health and Hospital System(Stroger); Emergency Department Patient Discharge Summary(one page).
8.) Norwegian American Hospital Admissions/Medication Reconciliation/Physician Order Form(four pages).
9.) Norwegian American Hospital/Patient Intervention Activity(three pages).
10.)Norwegian American Continuing Care Plan(one page).
11.)THRESHOLDS' Note 1/Care Plan/Intervention/Progress (two pages).
12.)THRESHOLDS' Note 2/Current Diagnosis(two pages).
13.)THRESHOLDS' Staff Intervention(two pages).

ILLINOIS DEPARTMENT OF CORRECTIONS

REPORTING INSTRUCTIONS


ROGERS, CLARENCE                          LAWRENCE
       (RELEASEE)                         (FACILITY)

        B00372                            09/05/2014
(DOC INSTITUTION NUMBER)                 (RELEASE DATE)


OUR RECORDS INDICATE YOUR RELEASE PLAN IS AS FOLLOWS:

HOME:           HARDIN HOUSE-MEN             AGENCY/INSTITUTION
                7528 S EGGLESTON

                CHICAGO        IL  60620
                773-488-1724

ASSIGNED PAROLE OFFICE:

                DISTRICT 1
                PM MIDTOWN/BOTY-AE
                1110 S. OAKLEY
                CHICAGO        IL  60612
                TELEPHONE NUMBER:  800-666-6744

REPORTING INSTRUCTIONS:  UPON RELEASE, GO DIRECTLY TO THE ASSIGNED
RESIDENCE LISTED ABOVE. UPON ARRIVAL SOME YOU SHOULD IMMEDIA___
CHECK IN AT THE PAROLE CONTROL CENTER BY CALLING 800-666-6744.
IF YOU HAVE NO TELEPHONE AT YOUR RESIDENCE YOU MAY LEAVE ONLY
TO USE THE NEAREST PUBLIC TELEPHONE TO CHECK IN. OTHERWISE,
DO NOT LEAVE HOME UNTIL YOUR AGENT MAKES HIS/HER INITIAL VISIT.
IF YOU DO NOT COMPLY WITH THIS REPORTING REQUIREMENT, YOU WILL BE
CONSIDERED TO BE IN VIOLATION OF YOUR RELEASE AGREEMENT AND A WARRANT
MAY BE ISSUED FOR YOUR ARREST.

ISP REGISTRY REQD:  NO

!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!
!                                                               !
! SPECIAL REPORTING INSTRUCTIONS: _____ !
! _____  !
!                                                               !
!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!


_____          _____
 (FIELD SERVICES REPRESENTATIVE)              (DATE)

I UNDERSTAND AND WILL COMPLY WITH THE ABOVE INSTRUCTIONS.


_____          _____
     (RELEASEE SIGNATURE)                     (DATE)


CC(3):  RELEASEE (ORIGINAL);  INSTITUTION;  PAROLE OFFICE

ILLINOIS DEPARTMENT OF CORRECTIONS

PRISONER REVIEW BOARD

# Parole or Mandatory Supervised Release Agreement

Name: Rogers (Last Name) Clarence (First Name) ___ (MI) B00372 (IDOC #)

This document constitutes an agreement governing persons who have been granted parole by the Illinois Prisoner Review Board or otherwise released under supervision, and defines the terms by which the undersigned is conditionally released from confinement. The regulations promulgated by the Prisoner Review Board or other releasing authority.

## Rules of Conduct Governing Parolees or Mandatory Supervised Releasees

Until final discharge, you shall at all times be under the legal custody of the Department of Corrections, subject to being retaken at any time, with the establishment of probable cause and with the lodging of a warrant, within the enclosure of an Illinois State correctional center. You are obligated to comply with all rules, regulations, orders, and subsequent amendments thereto of the Prisoner Review Board and of the Department of Corrections. If paroled or released out of the State, obedience of the rules of both states is required.

1. You shall not violate any criminal statute of any jurisdiction during the parole or release term;
2. You shall refrain from possessing a firearm or other dangerous weapon;
3. You shall report to an agent of the Department of Corrections;
4. You shall permit the agent to visit you at your home, employment, or elsewhere to the extent necessary for the agent to discharge his or her duties;
5. You shall attend or reside in a facility established for the instruction or residence of persons on parole or mandatory supervised release as may be directed;
6. You shall secure permission before visiting or writing a committed person in an Illinois Department of Corrections facility;
7. You shall report all arrests to an agent of the Department of Corrections as soon as permitted by the arresting authority but in no event later than 24 hours after release from custody;
8. You shall obtain the permission of the Department of Corrections before leaving the State of Illinois;
9. You shall obtain the permission of an agent of the Department of Corrections before changing your residence or employment;
10. You shall consent to a search of your person, property, or residence under your control; including computer(s), peripherals and any and all media;
11. You shall refrain from the use or possession of narcotics or other controlled substances in any form, or both, or any paraphernalia related to those substances and submit to a urinalysis test as instructed by a parole agent or the Department of Corrections;
12. You shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
13. You shall not knowingly associate with other persons on parole or mandatory supervised release without the prior written permission of your parole agent and shall not knowingly associate with persons who are members of an organized gang as that term is identified in the Illinois Street Gang Terrorism Omnibus Prevention Act;
14. You shall provide true and accurate information, as it relates to your adjustment in the community while on parole or mandatory supervised release or to your conduct while incarcerated, in response to inquiries by your parole agent or the Department of Corrections;
15. You shall follow any specific instructions provided by a parole agent that are consistent with furthering the conditions set and approved by the Prisoner Review Board or by law, exclusive of placement on electronic detention, to achieve the goals and objectives of your parole or mandatory supervised release, or to protect the public. These instructions by the parole agent may be modified at any time as the agent deems appropriate; and
16. You shall also comply with any additional conditions the Prisoner Review Board has or may set as a condition of your *parole or mandatory supervised release including, but not limited to:*

- [x] Substance Abuse Program
- [ ] No victim contact
- [ ] Participate in Sex Offender Counseling
- [x] Electronic Detention 6 Months
- [x] Submit yourself to outpatient care as prescribed by a Mental Health Clinic
- [ ] Anger Management Counseling
- [ ] None available at this time
- [ ] Other:

Documents provided upon release: [ ] Birth Certificate [ ] Social Security Card [ ] Temporary Identification Card

Distribution: Master File; Parole Office; Releasee; Releasee's Parent or Guardian, if applicable

*Printed on Recycled Paper*

DOC0104 (Rev. 04/2013)

ILLINOIS DEPARTMENT OF CORRECTIONS

PRISONER REVIEW BOARD

## Parole or Mandatory Supervised Release Agreement

Name: *Rogers*                    *Clarence*                    *B00372*
      Last Name                   First Name           MI      IDOC #

This document constitutes an agreement governing persons who have been granted parole by the Illinois Prisoner Review Board or otherwise released under supervision, and defines the terms by which the undersigned is conditionally released from confinement. The regulations promulgated by the Prisoner Review Board or other releasing authority.

### Rules of Conduct Governing Parolees or Mandatory Supervised Releasees

Until final discharge, you shall at all times be under the legal custody of the Department of Corrections, subject to being retaken at any time, with the establishment of probable cause and with the lodging of a warrant, within the enclosure of an Illinois State correctional center. You are obligated to comply with all rules, regulations, orders, and subsequent amendments thereto of the Prisoner Review Board and of the Department of Corrections. If paroled or released out of the State, obedience of the rules of both states is required.

1. You shall not violate any criminal statute of any jurisdiction during the parole or release term;
2. You shall refrain from possessing a firearm or other dangerous weapon;
3. You shall report to an agent of the Department of Corrections;
4. You shall permit the agent to visit you at your home, employment, or elsewhere to the extent necessary for the agent to discharge his or her duties;
5. You shall attend or reside in a facility established for the instruction or residence of persons on parole or mandatory supervised release as may be directed;
6. You shall secure permission before visiting or writing a committed person in an Illinois Department of Corrections facility;
7. You shall report all arrests to an agent of the Department of Corrections as soon as permitted by the arresting authority but in no event later than 24 hours after release from custody;
8. You shall obtain the permission of the Department of Corrections before leaving the State of Illinois;
9. You shall obtain the permission of an agent of the Department of Corrections before changing your residence or employment;
10. You shall consent to a search of your person, property, or residence under your control; including computer(s), peripherals and any and all media;
11. You shall refrain from the use or possession of narcotics or other controlled substances in any form, or both, or any paraphernalia related to those substances and submit to a urinalysis test as instructed by a parole agent or the Department of Corrections;
12. You shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
13. You shall not knowingly associate with other persons on parole or mandatory supervised release without the prior written permission of your parole agent and shall not knowingly associate with persons who are members of an organized gang as that term is identified in the Illinois Street Gang Terrorism Omnibus Prevention Act;
14. You shall provide true and accurate information, as it relates to your adjustment in the community while on parole or mandatory supervised release or to your conduct while incarcerated, in response to inquiries by your parole agent or the Department of Corrections;
15. You shall follow any specific instructions provided by a parole agent that are consistent with furthering the conditions set and approved by the Prisoner Review Board or by law, exclusive of placement on electronic detention, to achieve the goals and objectives of your parole or mandatory supervised release, or to protect the public. These instructions by the parole agent may be modified at any time as the agent deems appropriate; and
16. You shall also comply with any additional conditions the Prisoner Review Board has or may set as a condition of your parole or mandatory supervised release including, but not limited to:

☒ Substance Abuse Program          ☐ No victim contact          ☐ Participate in Sex Offender Counseling

☒ Electronic Detention *6 Months*  ☒ Submit yourself to outpatient care as prescribed by a Mental Health Clinic

☐ Anger Management Counseling      ☐ None available at this time   ☐ Other:

Documents provided upon release:  ☐ Birth Certificate  ☐ Social Security Card  ☐ Temporary Identification Card

ILLINOIS DEPARTMENT OF CORRECTIONS

REPORTING INSTRUCTIONS

ROGERS, CLARENCE
_____
(RELEASEE)

LAWRENCE
_____
(FACILITY)

B00372
_____
(DOC INSTITUTION NUMBER)

09/05/2014
_____
(RELEASE DATE)

OUR RECORDS INDICATE YOUR RELEASE PLAN IS AS FOLLOWS:

HOME:            HARDIN HOUSE-MEN          AGENCY/INSTITUTION
                 7528 S EGGLESTON

                 CHICAGO        IL   60620
                 773-488-1724

ASSIGNED PAROLE OFFICE:

                 DISTRICT 1
                 PM MIDTOWN/BOTY-AE
                 1110 S. OAKLEY
                 CHICAGO        IL   60612
                 TELEPHONE NUMBER:   800-666-6744

REPORTING INSTRUCTIONS:  UPON RELEASE, GO DIRECTLY TO THE ASSIGNED
RESIDENCE LISTED ABOVE. UPON ARRIVAL HOME YOU SHOULD IMMEDIATELY
CHECK IN AT THE PAROLE CONTROL CENTER BY CALLING 800-666-6744.
IF YOU HAVE NO TELEPHONE AT YOUR RESIDENCE YOU MAY LEAVE ONLY
TO USE THE NEAREST PUBLIC TELEPHONE TO CHECK IN. OTHERWISE,
DO NOT LEAVE HOME UNTIL YOUR AGENT MAKES HIS/HER INITIAL VISIT.
IF YOU DO NOT COMPLY WITH THIS REPORTING REQUIREMENT, YOU WILL BE
CONSIDERED TO BE IN VIOLATION OF YOUR RELEASE AGREEMENT AND A WARRANT
MAY BE ISSUED FOR YOUR ARREST.

ISP REGISTRY REQD:  NO

!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!
!                                                               !
! SPECIAL REPORTING INSTRUCTIONS: _____ !
!                                _____ !
!                                _____ !
!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!

_____          _____
     (FIELD SERVICES REPRESENTATIVE)                   (DATE)

I UNDERSTAND AND WILL COMPLY WITH THE ABOVE INSTRUCTIONS.

_____          _____
         (RELEASEE SIGNATURE)                          (DATE)

CC(3):  RELEASEE (ORIGINAL);  INSTITUTION;  PAROLE OFFICE

ILLINOIS DEPARTMENT OF CORRECTIONS

**Electronic Detention Program Agreement**

**Terms and Conditions of the Electronic Detention Program**

I understand that while I am on electronic detention, I will be confined to my residence except as approved by the Department for participation in program activities or in the case of an emergency. Furthermore, I hereby agree to comply with the rules of the Department of Corrections and the Spotlight Re-entry Program, and the terms and conditions of the Electronic Detention Program as follows:

- I agree to remain within the limits of my approved weekly schedule and agree to contact my Parole Agent for approval prior to any deviations from the weekly itinerary. I understand that failure to comply with the approved itinerary may result in my being disciplined and/or prosecuted for escape and face violations of MSR.
- I agree to report to the Spotlight Re-entry Center or to a site designated by my Parole Agent at a designated time, when so directed by my Parole Agent or other person designated by the Department of Corrections.
- I agree to pay the required maintenance fee as determined by the Department of Corrections.
- I will not use or knowingly have under my control marijuana, controlled substances, narcotics, intoxicants, drug paraphernalia, or prescription medications, except as approved by a physician. I will not use or knowingly have under my control or in my residence any firearms, ammunition, or explosive devices; nor will I knowingly ride in any vehicle that contains such items. Furthermore, I will not knowingly visit places where drugs, controlled substances, intoxicants, firearms, ammunition, or other dangerous substances, or explosive devices are used or sold.
- I understand that I, and my host site, shall be subject to search for any reason and at any time by Department staff. I further understand that I am subject to drug and alcohol testing by Department staff at any time for any reason and I agree to cooperate in such testing.
- I agree to permit staff of the Department and the monitoring service employed by the Department to have access to my residence to install, inspect, repair, maintain, or disconnect electronic detention equipment to the telephone in my residence. I agree to have an electronic transmitter affixed to my person which I agree to wear 24 hours per day until such time as the Department authorizes its removal. I agree not to unplug, move, remove, or tamper with the electronic detention equipment. I further agree that upon termination from the program, all electronic detention equipment shall be returned to the Department in the same condition as it was received. I understand that I am responsible for the cost of repairs or replacement of any lost or damaged equipment and hereby consent to reimburse the Department.
- I understand that special telephone features, such as call forwarding, call waiting, or any other feature prohibited by the Department will not be installed on the telephone in my residence that will be used with electronic detention equipment.
- I agree to notify my Parole Agent or the Spotlight Re-entry Center immediately, or as soon as I become aware, of any damage to the transmitter, its strap, the receiver connected to the telephone line, the visual telephone, or any other electronic detention monitoring equipment. I understand that if I fail to notify my Parole Agent or the Spotlight Re-entry Center of any damage or any unintentional action that may have altered the equipment or its functions, I may be charged with tampering with the equipment.
- I agree not to enter into any legal contracts or agreements without prior permission.
- I agree to only travel to and from my destination by the means of approved transportation. I further agree not to operate a motor vehicle without prior approval.
- I agree to notify my Parole Agent or Transition Center before receiving any medical or dental treatment, except in cases of emergency.
- I agree to notify my Parole Agent as soon as possible of any request to move from the host site. This includes a request to move with the same host to a new address, or to move to a new address with a new host, or a change in telephone number. I understand that such change may require prior approval.
- I understand that my placement on electronic detention may be terminated by the Department at any time. I agree to immediately report to the Spotlight Re-entry Center upon termination from the program or as directed by my Parole Agent.
- Unless otherwise instructed I am expected to report to the Spotlight Re-entry Center on my tentative MSR date. I understand that this tentative MSR date is subject to change due to the granting of SMGT, MGT, Educational Good Conduct Credits, and the loss of good time.

Distribution:     Master File
                  Electronic Detention File
                  Offender

*Printed on Recycled Paper*                                    DOC 0180 (Eff. 11/2007)
                                                              (Replaces DCA 3866)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Electronic Detention Program Agreement**

---

**The following conditions of the Program Agreement apply only to sex offender cases.**

In addition to the above terms and conditions:

- I understand that I am to have no items of a pornographic nature of any kind in my home, vehicle, workplace, or in my possession at any time.
- I understand that I am prohibited from possessing or accessing computers, internet, or any means of electronic transfer images without prior written permission from my Parole Agent. I further consent to the search of any of these instruments or media by the Department of Corrections.
- I understand that I am to have no unsupervised contact with any person under the age of 18 unless specifically authorized by an agent of the Department of Corrections.
- I understand that I am not to participate in any holiday activities that involves any person under the age of 18.
- I understand that I am prohibited from wearing or possessing any costume that can be reasonably interpreted as being that of any child oriented holiday including, but not limited to, Santa Claus and the Easter Bunny.
- I understand that I am not allowed to answer my door for any other person other than a Parole Agent or other law enforcement official, nor am I allowed have my porch light on or distribute candy or other items before, on, or after Halloween.
- I understand that I am also not allowed to answer my door for Christmas carolers or underage solicitors of any kind.

---

Offender Name: _Rogers, Clarence_          ID#: _B00372_

Tentative MSR Date: _9-5-2014_

I, the above named, will be participating in the Electronic Detention Program where all movement will be monitored through the use of electronic detention equipment. I will be residing with the following person(s) at the given address:

- Name(s) of person(s) with whom I will be residing: _Hardin House_

- Address where I will be residing: _7528 S. Eggleston_
  Street Address (including apartment number)
  _Chicago, IL 60620_
  City, State, Zip Code

I hereby certify that I have read and understand the attached Terms and Conditions of the Electronic Detention Program and hereby agree to abide by these conditions as long as I am a participant in the program.

_____          _____
Offender Signature                                           Date

_____          _____
Staff Signature                                               Date

Page 2 of 2

Distribution:   Master File
                Electronic Detention File
                Offender

Printed on Recycled Paper

DOC 0180 (Eff. 11/2007)
(Replaces DCA 3866)

   

**Notification Letter**

Date: August 12, 2014

Offender: <u>CLARENCE ROGERS</u>:
   Print Name

   This letter is to advise you of important information. As an offender on release/parole, you cannot possess a gun or other dangerous weapons. IDOC will arrest you if you are a parolee / releasee caught with a gun or other dangerous weapons.

   Your name has been given to federal law enforcement agencies because of your arrest and prosecution by state and local authorities. **Any** future offense by you involving the use or mere possession of a firearm or ammunition will be reviewed by the United States Attorney's Office for **federal prosecution**. This new procedure is part of a federally funded program named Project Safe Neighborhoods. As a convicted felon, you can be prosecuted in federal court even if you only possess a gun, which typically results in a **five-year sentence.** You may also be prosecuted as an Armed Career Criminal, and go to federal prison for a **minimum of fifteen years** without any chance of parole.

   If convicted in federal court, you will serve your time in one of the federal prisons across the United States. Again, the federal system has **no parole** and no "day-for-a-day" good time credit.

   I, <u>CLARENCE ROGERS</u>, have read the above warning about being prosecuted in federal court for possessing a gun and understand that I will be required to attend a Project Safe Neighborhood meeting if instructed by parole division staff.

X_____          _____
                    Offender's Signature                                              Date

☐ A copy of this letter has been provided to the offender, but the offender refused to sign.

   <u>S.Pierce/E.Bare</u>_____          <u>CC II</u>_____          _____
              Staff's Signature                              Title               Date

Distribution: Master file; Offender                                      DOC 0144(Rev. 12/2004)

ILLINOIS DEPARTMENT OF CORRECTIONS
## Possession of Dogs by a Felon Notification

**Law**

Pursuant to 720 ILCS 5/12-36, possession of certain dogs by felons is prohibited for 10 years following release from incarceration.

It is unlawful for persons convicted of the following felonies to knowingly own, possess, have custody of, or reside in a residence with either an unspayed or unneutered dog or puppy older than 12 weeks or a dog determined to be vicious under Section 15 of the Animal Control Act.

- A forcible felony (Conviction of one of the following crimes: Treason; First Degree Murder; Second Degree Murder; Predatory criminal sexual assault of a child; Aggravated criminal sexual assault; Criminal sexual assault; Robbery; Burglary; Residential burglary; Aggravated arson; Arson; Aggravated kidnapping; Kidnapping; Aggravated battery resulting in great bodily harm or permanent disability or disfigurement; or Any other felony which involves the use or threat of physical force or violence against any individual.)
- A felony violation of the Humane Care for Animals Act
- A felony violation of section 26-5 of Article 26 of the Criminal Code – (dog fighting)
- A felony violation of Article 24 of the Criminal Code – (possession of weapons)
- A felony violation of Class 3 or higher of the Controlled Substances Act
- A felony violation of Class 3 or higher of the Cannabis Control Act
- A felony violation of Class 2 or higher of the Methamphetamine Act

The law also requires that any dog; owned, possessed by, or in your custody must be micro-chipped for permanent identification.

A person convicted of violating this law is guilty of a Class A misdemeanor.

**Parole or Mandatory Supervised Release Instructions**

Pursuant to Rule 15 of the Parole or Mandatory Supervised Release Agreement, you are hereby directed to:

- Notify your parole agent if you own or live with a dog.
- Provide proof that the dog was spayed or neutered and that it has a micro-chip. Acceptable proof: The dog's medical records or a certificate of spaying/neutering from a veterinarian who personally examined or operated upon the dog are acceptable proof that the dog is spayed or neutered. The veterinarian who implants the micro-chip can provide you with documents that the dog has a micro-chip.
- Keep the micro-chip identification information current.

**Acknowledgement of Information**

I  CLARENCE ROGERS    B00372   have received this information and understand
    Print Offender's Name        ID #

that my failure to comply is a violation of State Law and if applicable, my Parole or Mandatory Supervised Release Agreement Rules 1 and 15. I further understand that the failure to comply may result in a conviction of a Class A misdemeanor and if applicable, revocation of my parole or mandatory supervised release.

X _____          _____
        Offender's Signature                    Date

☐ Offender refused to sign.

S.Pierce/E.Bare _____          _____
     Print Name of Witness                 Signature of Witness          Date

Distribution: Master File; Parole Office;          DOC 0327 (Rev. 1/2010)
              Offender

*Printed on Recycled Paper*
*Printed on Recycled Paper*

ILLINOIS DEPARTMENT OF CORRECTIONS

## Possession of Dogs by a Felon Notification

**Law**

Pursuant to 720 ILCS 5/12-36, possession of certain dogs by felons is prohibited for 10 years following release from incarceration.

It is unlawful for persons convicted of the following felonies to knowingly own, possess, have custody of, or reside in a residence with either an unspayed or unneutered dog or puppy older than 12 weeks or a dog determined to be vicious under Section 15 of the Animal Control Act.

- A forcible felony (Conviction of one of the following crimes: Treason; First Degree Murder; Second Degree Murder; Predatory criminal sexual assault of a child; Aggravated criminal sexual assault; Criminal sexual assault; Robbery; Burglary; Residential burglary; Aggravated arson; Arson; Aggravated kidnapping; Kidnapping; Aggravated battery resulting in great bodily harm or permanent disability or disfigurement; or Any other felony which involves the use or threat of physical force or violence against any individual.)
- A felony violation of the Humane Care for Animals Act
- A felony violation of section 26-5 of Article 26 of the Criminal Code – (dog fighting)
- A felony violation of Article 24 of the Criminal Code – (possession of weapons)
- A felony violation of Class 3 or higher of the Controlled Substances Act
- A felony violation of Class 3 or higher of the Cannabis Control Act
- A felony violation of Class 2 or higher of the Methamphetamine Act

The law also requires that any dog; owned, possessed by, or in your custody must be micro-chipped for permanent identification.

A person convicted of violating this law is guilty of a Class A misdemeanor.

**Parole or Mandatory Supervised Release Instructions**

Pursuant to Rule 15 of the Parole or Mandatory Supervised Release Agreement, you are hereby directed to:

- Notify your parole agent if you own or live with a dog.
- Provide proof that the dog was spayed or neutered and that it has a micro-chip. Acceptable proof: The dog's medical records or a certificate of spaying/neutering from a veterinarian who personally examined or operated upon the dog are acceptable proof that the dog is spayed or neutered. The veterinarian who implants the micro-chip can provide you with documents that the dog has a micro-chip.
- Keep the micro-chip identification information current.

**Acknowledgement of Information**

I __CLARENCE ROGERS__ __B00372__ have received this information and understand
  Print Offender's Name          ID #

that my failure to comply is a violation of State Law and if applicable, my Parole or Mandatory Supervised Release Agreement Rules 1 and 15. I further understand that the failure to comply may result in a conviction of a Class A misdemeanor and if applicable, revocation of my parole or mandatory supervised release.

X _____    _____
      Offender's Signature                              Date

☐ Offender refused to sign.

S.Pierce/E.Bare _____    _____
   Print Name of Witness                  Signature of Witness                Date

Distribution: Master File; Parole Office;      *Printed on Recycled Paper*      DOC 0327 (Rev. 1/2010)
                   Offender                     Printed on Recycled Paper

   

**P R O J E C T**
# SAFE
**NEIGHBORHOODS**
America's Network Against Gun Violence

---

### Notification Letter

Date: August 12, 2014

Offender: <u>CLARENCE ROGERS</u>:
      Print Name

This letter is to advise you of important information. As an offender on release/parole, you cannot possess a gun or other dangerous weapons. IDOC will arrest you if you are a parolee / releasee caught with a gun or other dangerous weapons.

Your name has been given to federal law enforcement agencies because of your arrest and prosecution by state and local authorities. **Any** future offense by you involving the use or mere possession of a firearm or ammunition will be reviewed by the United States Attorney's Office for **federal prosecution**. This new procedure is part of a federally funded program named Project Safe Neighborhoods. As a convicted felon, you can be prosecuted in federal court even if you only possess a gun, which typically results in a **five-year sentence.** You may also be prosecuted as an Armed Career Criminal, and go to federal prison for a **minimum of fifteen years** without any chance of parole.

If convicted in federal court, you will serve your time in one of the federal prisons across the United States. Again, the federal system has **no parole** and no "day-for-a-day" good time credit.

I, <u>CLARENCE ROGERS</u>, have read the above warning about being prosecuted in federal court for possessing a gun and understand that I will be required to attend a Project Safe Neighborhood meeting if instructed by parole division staff.

**X**_____     _____
                            Offender's Signature                         Date

☐   A copy of this letter has been provided to the offender, but the offender refused to sign.

    S.Pierce/E.Bare_____     CC II_____     _____
                Staff's Signature                     Title                 Date

Distribution: Master file; Offender                                          DOC 0144(Rev. 12/2004)

House Arrest
Equipment

BI Homeguard 206 DS
Receiver Model No.
HG206R

FCC ID AU792U0961782S

FCC Registration No

GN7-USA-2ZS02-MDE

P/N 1-40-80316-2 REV A

x . . . . . . . . . . BIND HERE . . . . . . . . . . x

## MUNICIPAL GENERAL ELECTION
## PETITION

We, the undersigned, being duly qualified and registered voters of the City of Chicago, County of Cook, State of Illinois, do hereby petition that the following named person shall be a candidate for election to the office hereinafter specified, to be voted for at the Municipal General Election to be held on the Twenty-Fourth (24th) day of February, 2015.

| NAME | OFFICE | ADDRESS |
|---|---|---|
| **WILLIE WILSON** | **MAYOR**<br>**OF THE CITY OF CHICAGO**<br>**COOK COUNTY**<br>**STATE OF ILLINOIS** | **345 EAST WACKER DRIVE**<br>**SUITE 4601**<br>**CHICAGO, ILLINOIS 60601** |

| SIGNATURE OF QUALIFIED VOTER<br>ALL MUST BE WRITTEN BY THE VOTER IN PERSON | RESIDENCE ADDRESS<br>THIS SHALL INCLUDE HOUSE NUMBER AND NAME OF STREET | CITY, TOWN<br>OR VILLAGE | COUNTY<br>AND STATE |
|---|---|---|---|
| 1 | | CHICAGO | COOK, IL |
| 2 | | CHICAGO | COOK, IL |
| 3 | | CHICAGO | COOK, IL |
| 4 | | CHICAGO | COOK, IL |
| 5 | | CHICAGO | COOK, IL |
| 6 | | CHICAGO | COOK, IL |
| 7 | | CHICAGO | COOK, IL |
| 8 | | CHICAGO | COOK, IL |
| 9 | | CHICAGO | COOK, IL |
| 10 | | CHICAGO | COOK, ILL |
| 11 | | CHICAGO | COOK, IL |
| 12 | | CHICAGO | COOK, IL |
| 13 | | CHICAGO | COOK, IL |
| 14 | | CHICAGO | COOK, IL |
| 15 | | CHICAGO | COOK, IL |

**STATE OF ILLINOIS** } ss.
**COUNTY OF COOK**

I, _____, (circulator's name) being first duly sworn, do hereby certify that I reside at _____, in the City/Village/Unincorporated area (circle one) of _____ (if unincorporated, list municipality that provides postal service) ZIP Code_____, County of _____, and State of Illinois, that I am eighteen (18) years of age or older, that I am a citizen of the United States, and that the signatures on this sheet were signed in my presence, and are genuine and that none of the signatures on this sheet were signed more than 90 days preceding the last day for the filing of the petition, and that to the best of my knowledge and belief the persons so signing were, at the time of signing the petition duly qualified and registered voters of the City of Chicago, County of Cook, and State of Illinois, and that their respective residence addresses are correctly stated as above set forth.

_____
(Circulator's Signature)

Signed and Sworn to (or affirmed) before me on _____, 2014 by _____

_____
(Print Name of Circulator Here)

_____
SIGNATURE OF NOTARY PUBLIC

(SEAL OR STAMP
OF NOTARY PUBLIC)

SHEET NO.: _____



PROGRESS PRINTING

# Cook County Health and Hospitals System
## Stroger – Cook County Hospital
### 1901 West Ogden Ave
### Chicago, IL 60612
### 312.864.6000

## Emergency Department Patient Discharge Summary

**Name:** ROGERS, CLARENCE                                        **Age:** 51 Years
**Medical Record Number:** 000823680c
**Date of Emergency Department Visit:** 10/18/2014 01:17:05
**Discharge Diagnoses:**

**PCP:** JABBAR MD, UMAIR
**PCP Phone:** (312) 864-6000
**Primary Care Clinic:** Fantus GMC B

The Department of Emergency Medicine would like to thank you for allowing us to assist you with your healthcare needs. The following is a summary of your prescriptions, home medications, clinic follow-up and patient education information.

We examined you today and treated you on an emergency basis only. In most cases you will require follow-up with your doctor or a specialist we have referred you to during this visit. If you have no primary care physician you can follow-up at the Ambulatory Screening Clinic (ASC). The ASC is located on 1st floor of the Fantus Clinic building that is located across the driveway from the Emergency Department. It is best to arrive at the ASC early as patients are seen on a first come – first serve basis. The hours of operation are Monday – Friday from 7am-5pm and Saturday – Sunday from 7am-3pm.

All x-rays were interpreted today on an emergency basis and will be reviewed again within 24 hours. We will contact you with any further updates based on when the x-rays are re-checked.

If you require financial assistance to help with your hospital bill, please visit our CareLink office that is located in room 1690 in the front lobby of the hospital. You can also call the CareLink office for more information at 312.864.4640. More information can be found on our web site *www.cookcountyhealth.net*.

**If you do not currently have any medical insurance, you may be eligible for the new CountyCare Medicaid Medical Card with no co-pays. Please call 312.864.8200 to apply.**

We value your opinion regarding the care and services you received. You may be selected to receive a patient satisfaction survey. Your responses will greatly help us to continually improve our services to everyone. Thank you for choosing our hospital.

*If your symptoms become worse, you should call your physician. If you need immediate assistance call '911' or go to an Emergency Department.*

NAH-6041

| DATE: 10/27/14 @ 1242 | Norwegian American Admissions *LIVE* | PAGE 1 |
| USER: NUR.JBT | Medication Reconciliation / Physician Order Form | |

**ROGERS,CLARENCE** 09/18/1963 51M 175.3cm/99.34kg        N020299426/M507138        Rm:376-01
**Admit DX:** DEPRESSIVE D/O                                                   **Admit Date:** 10/19/14
**Admitting Doctor:** Patel MD,Shephali                                         **Status:** ADM IN

Coded Allergies:
    No Known Drug Allergies - Nkda

Pneumonia Vaccine - Date: _____    Flu Vaccine - Date: _____    Pregnant: Y [ ]/N [ ]    Lactating: Y [ ]/N [ ]

Reconciliation Event:    [ ] Admit        [ ] Update        [ ] Post-Op / Transfer        [X] Discharge

## New Orders / Changes to Meds Must be Submitted on a Separate Order Sheet

| Patient Home Medication List | Inpatient Scheduled Medication |
|---|---|
| | KEY: [Cont]=Continue |
| **Medication** | **Medication** [Stop]=Stop |
| **Dose      Route      Frequency** | **Dose      Route      Frequency** [Mod]=Modify |
| | [Cont] [ ] |
| | ACETAMINOPHEN 325 MG                                    [Stop] [ ] |
| | (TYLENOL-REGULAR)                                   [Mod] [ ] |
| | 650 MG        ORAL      EVERY SIX HRS PRN |
| | FEVER OR MILD PAIN (1-3 PAIN) |
| | FOR HEADACHE |
| Fluoxetine Hcl 10 MG            (Continue) | [Cont] [ ] |
| (Prozac )                       [Stop] [ ] | FLUOXETINE HCL 20 MG                                [Stop] [ ] |
| 20 MG      ORAL      DAILY      [Modify] [ ] | (PROZAC)                                           [Mod] [ ] |
| | 20 MG      ORAL      DAILY 0900 |
| | USE: TX DEPRESSION, OCD, BULIMIA NERVOSA |
| | PAE: INSOMNIA, DIARRHEA, TREMOR, HA |
| Last Dose: | |
| | [Cont] [ ] |
| | HALOPERIDOL 5 MG                                       [Stop] [ ] |
| | (HALDOL)                                            [Mod] [ ] |
| | 5 MG        ORAL      EVERY 4 HOURS AS NEEDED |
| | AGITATION |
| | USE:ANTIPSYCHOTIC;SEDATIVE; FOR SCHIZOPHRENIA AND |
| | TOURETTE'S |
| | PAE:BP CHANGES,TACHYCARDIA,RASH,GI UPSET,URINARY |
| | RETENTION |
| | [Cont] [ ] |
| | HALOPERIDOL                                           [Stop] [ ] |
| | (HALDOL)                                            [Mod] [ ] |
| | 5 MG        INTRA-MUSCUL  EVERY 4 HOURS AS NEEDED |
| | USE:ANTIPSYCHOTIC;SEDATIVE; FOR SCHIZOPHRENIA AND |
| | TOURETTE'S |
| | PAE:BP CHANGES,TACHYCARDIA,RASH,GI UPSET,URINARY |
| | RETENTION |

Physician Initials: _____        RN Initials: _____        RN Initials: _____

NAH-6041

DATE: 10/27/14 @ 1242
USER: NUR.JBT

Norwegian American Admissions *LIVE*
Medication Reconciliation / Physician Order Form

PAGE 2

**ROGERS,CLARENCE** 09/18/1963 51M 175.3cm/99.34kg
Admit DX: DEPRESSIVE D/O
**Admitting Doctor:** Patel MD,Shephali

N020299426/M507138

Rm:376-01
**Admit Date:** 10/19/14
**Status:** ADM IN

Coded Allergies:
No Known Drug Allergies - Nkda

Pneumonia Vaccine - Date: _____    Flu Vaccine - Date: _____    **Pregnant:** Y [ ]/N [ ]    **Lactating:** Y [ ]/N [ ]

**Reconciliation Event:**    [ ] Admit    [ ] Update    [ ] Post-Op / Transfer    [X] Discharge

## New Orders / Changes to Meds Must be Submitted on a Separate Order Sheet

| Patient Home Medication List | Inpatient Scheduled Medication |
|---|---|
| **Medication**<br>Dose        Route        Frequency | KEY: [Cont]=Continue<br>[Stop]=Stop<br>[Mod]=Modify<br>**Medication**<br>Dose        Route        Frequency |
| [Continue] [ ]<br>Hydrochlorthiazide 12.5 MG        [Stop] [ ]<br>(Oretic )                            [Modify] [ ]<br>\|12.5 MG        \|ORAL        \|DAILY<br><br>Last Dose: | [Cont] [ ]<br>HYDROCHLORTHIAZIDE        [Stop] [ ]<br>(ORETIC)                    [Mod] [ ]<br>\|12.5 MG        \|ORAL        \|DAILY<br><br>USE:DIURETIC<br>PAE:HYPOTENSION,HYPOKALEMIA |
| [Continue] [ ]<br>Ibuprofen 600 MG            [Stop] [ ]<br>(Motrin )                  [Modify] [ ]<br>\|600 MG        \|ORAL        QID PRN<br>    PRN < AS NEEDED ><br>Last Dose: | [Cont] [ ]<br>IBUPROFEN 600 MG            [Stop] [ ]<br>(MOTRIN)                    [Mod] [ ]<br>\|600 MG        \|ORAL        FOUR TIMES A DAY AS NEEDED<br>PAIN MILD (1-3 ON PAIN SCALE) |
| | [Cont] [ ]<br>LATANOPROST 0.005% 2.5 ML        [Stop] [ ]<br>(XALATAN)                        [Mod] [ ]<br>1 DROP TO BO  OPHTHALMIC        2030 AT BEDTIME<br><br>REFRIGERATE<br>1 DROP TO BOTH EYES |
| [Continue] [ ]<br>LATANOPROST 2.5 ML            [Stop] [ ]<br>(LATANOPROST 2.5 ML )        [Modify] [ ]<br>2.5 ML        OPHTHALMIC        BID OU<br><br>Last Dose: | |
| | [Cont] [ ]<br>MILK OF MAGNESIA            [Stop] [ ]<br>(MILK OF MAGNESIA)          [Mod] [ ]<br>30 ML        ORAL        AT BED TIME AS NEEDED<br>FOR CONSTIPATION |

Physician Initials: _____        RN Initials: _____        RN Initials: _____

NAH-6041

| DATE: 10/27/14 @ 1242 | Norwegian American Admissions *LIVE* | PAGE 3 |
| USER: NUR.JBT | Medication Reconciliation / Physician Order Form | |

**ROGERS,CLARENCE** 09/18/1963 51M 175.3cm/99.34kg     N020299426/M507138     Rm:376-01
Admit DX: DEPRESSIVE D/O     Admit Date: 10/19/14
**Admitting Doctor:** Patel MD,Shephali     Status: ADM IN

Coded Allergies:
  No Known Drug Allergies - Nkda

Pneumonia Vaccine - Date: _____    Flu Vaccine - Date: _____    **Pregnant:** Y [ ]/N [ ]    **Lactating:** Y [ ]/N [ ]

**Reconciliation Event:**    [ ] Admit     [ ] Update     [ ] Post-Op / Transfer     [X] Discharge

## New Orders / Changes to Meds Must be Submitted on a Separate Order Sheet

| Patient Home Medication List | Inpatient Scheduled Medication |
|---|---|
| **Medication** <br> **Dose**   Route   Frequency | **Medication** <br> **Dose**   Route   Frequency    KEY: [Cont]=Continue [Stop]=Stop [Mod]=Modify |
| | MYLANTA 30 ML <br> (MYLANTA REGULAR) <br> 30 ML    ORAL    EVERY SIX HRS PRN CONSTIPATION <br> USE FOR MAALOX OR GELUSIL. <br> SHAKE WELL.    [Cont] [ ] [Stop] [ ] [Mod] [ ] |
| | NICORETTE GUM <br> (NICORETTE) <br> 2 MG    CHEW    EVERY 2 HOURS AS NEEDED <br> RETURN WRAPPER TO PHARMACY    [Cont] [ ] [Stop] [ ] [Mod] [ ] |
| | PT'S OWN SUPPLY:SEE COMMENT <br> (PATIENT OWN SUPPLY) <br> PATIENT'S ME ORAL   USE AS DIRECTED <br> PATIENT'S MEDICATIONS HAVE BEEN DROPPED OFF IN THE <br> PHARMACY. THIS IS A REMINDER TO ENSURE THEY ARE <br> PICKED UP PRIOR TO THE PATIENT GOING HOME. <br> PATIENT'S MEDICATIONS HAVE BEEN DROPPED OFF IN THE <br> PHARMACY. THIS IS A REMINDER TO ENSURE THEY ARE <br> PICKED UP PRIOR TO THE PATIENT GOING HOME.    [Cont] [ ] [Stop] [ ] [Mod] [ ] |
| Quetiapine Fumarate 200 MG <br> (Seroquel ) <br> 200 MG   ORAL   2030 AT BEDTIME <br> Last Dose: 10/26/14 2100 <br> [Continue] [Stop] [ ] [Modify] [ ] | QUEtiapine FUMARATE <br> (SEROQUEL) <br> 200 MG   ORAL   2030 AT BEDTIME <br> WARNING! look alike: serTRALIN    [Cont] [ ] [Stop] [ ] [Mod] [ ] |
| Quetiapine Fumarate 200 MG <br> (Seroquel ) <br> 100 MG   ORAL   EVERY MORNING 0900 <br> Last Dose: 10/27/14 0900 <br> [Continue] [Stop] [ ] [Modify] [ ] | QUEtiapine FUMARATE 100 MG <br> (SEROQUEL) <br> 100 MG   ORAL   DAILY 0900    [Cont] [ ] [Stop] [ ] [Mod] [ ] |

Physician Initials: _____     RN Initials: _____     RN Initials: _____

NAH-6041

DATE: 10/27/14 @ 1242
USER: NUR.JBT

Norwegian American Admissions *LIVE*
Medication Reconciliation / Physician Order Form

PAGE 4

**ROGERS,CLARENCE  09/18/1963 51M 175.3cm/99.34kg**
**Admit DX:** DEPRESSIVE D/O
**Admitting Doctor:** Patel MD,Shephali

N020299426/M507138

Rm:**376-01**
**Admit Date:** 10/19/14
**Status:** ADM IN

Coded Allergies:
   No Known Drug Allergies - Nkda

Pneumonia Vaccine - Date: _____     Flu Vaccine - Date: _____     Pregnant: Y [ ]/N [ ]     Lactating: Y [ ]/N [ ]

Reconciliation Event:     [ ] Admit          [ ] Update          [ ] Post-Op / Transfer          [X] Discharge

## New Orders / Changes to Meds Must be Submitted on a Separate Order Sheet

| Patient Home Medication List | Inpatient Scheduled Medication | | |
|---|---|---|---|
| | | | KEY: [Cont]=Continue |
| Medication | Medication | | [Stop]=Stop |
| Dose        Route        Frequency | Dose        Route        Frequency | | [Mod]=Modify |

Physician Signature: _____        DATE:            TIME:

Nurse Signature: _____        DATE:            TIME:

Nurse Signature: _____        DATE: 10/27/14 TIME: 1300

*****End of Report*****

```
RUN DATE: 10/27/14      Norwegian American Hosp Nursing **LIVE**          PAGE 1
RUN TIME: 1201              PATIENT INTERVENTION ACTIVITY
RUN USER: 0
```

```
Patient: ROGERS,CLARENCE                              Age/Sex: 51 M
Account #: N020299426                                 Unit #: M507138
Admit Date: 10/19/14                                  Location: 3D
Status: ADM IN                                        Room/Bed: 376-01
Attending: Patel MD,Shephali
```

```
Number    Description                              Status     Source
4800      NURSING D/C INSTRUCTIONS                 A          PS
                        Date       Time Directions
                      1  10/19/14 0235 .Discharge
```

```
        Documented at 10/27/14 1153 by JBT
```

    Discharge date: 10/27/14     Discharge time:
    Discharge disposition~ Shelter
Information recorded on admission.
 Discharge destination ~o: Home
Name of facility if known: NONE
  Anticipated DC needs ~o: TO CALL AND NOTIFY POLICE
                        FOR BEING DISCHARGED
Changes in discharge plan since admission:
NO
Accompanied by~ Other                    Via~ Walking
Discharge mode comment: STABLE CONDITION,.
Vital Signs
                    Temp: 98.8          Resp: 20
                    Pulse: 86           B/P: 109/69
                                                      Next pg <Enter>
All home medications noted upon admission have been reviewed with the patient? Y
Did the patient bring their own Home Medications? Y   (PRESS F5)
        If Yes, medications were given/sent to~o: Pharmacy          (PRESS F5)
= If sent to Pharmacy, Nurse has to pick them up and return to~ Patient
= If given to Family upon Admission, remind patient & other fam. members =
        Patient belongings form completed and signed by patient? Y
        Does patient need to have vaccine rescreening or admin? N
Does the patient have a hx or current CHF Diagnosis this visit? Y
                        CHF- Activity recommendations provided? Y
              CHF- Weight management recommendations provided?
              CHF- Symptom management recommendations provided? Y
          CHF- Medication management recommendations provided? Y
                        CHF- Diet teaching provided by~ Nurse
Smoking cessation information given if patient is a current
smoker or has stopped smoking less than 1 year priorto admission~ No smoking last 12 mos
                                                      Next pg <Enter>
Other discharge teaching provided r/t appropriate diagnosis.  Click on box if <YES>.
        Cardiac? Y      Pneumonia? N         AMI? N
      Diabetic? N   Respiratory? N    Post-Op? N
    Infant Care? N   Post-partum? N
            ==========================================================
            Is patient D/C on Warfarin(Coumadin)?         N
                VTE D/C education materials given to the patient~
VTE D/C instruction included adverse drug reaction education
   VTE D/C instruction included drug interactions education
      VTE D/C instruction included INR monitoring education
VTE D/C instruction included medication compliance education
  VTE D/C instruction included Vit K dietary management edu.

```
RUN DATE: 10/27/14      Norwegian American Hosp Nursing **LIVE**           PAGE 2
RUN TIME: 1201             PATIENT INTERVENTION ACTIVITY
RUN USER: 0
```

Patient: ROGERS,CLARENCE                              Age/Sex: 51 M
Account #: N020299426                                 Unit #: M507138
Admit Date: 10/19/14                                  Location: 3D
Status: ADM IN                                        Room/Bed: 376-01
Attending: Patel MD,Shephali

```
   VTE D/C instruction included regarding follow-up monitoring
       VTE D/C instruction included advice not to change diet
                                                      Next pg <Enter>
                  =============== STROKE D/C ASSESSMENT ===============
                      Stroke D/C education materials provided? No
            Stroke D/C instructions given on activation of EMS?
Stroke D/C instructions given for follow-up appointment(s)?
             Stroke D/C instructions given on meds prescribed?
        Stroke D/C instructions given on stroke risk factors?
             Stroke D/C education on stroke warning signs?
                   Reason why stroke education NOT done~
            If patient non-compliant specify reason~o:
    Was the Patient Health Summary printed at discharged? Y
             Did pt receive copy of discharge instructions? No
           Resume normal activities-no restrictions? Y      Restricted? N
Activity at home comment:

                                                      Next pg <Enter>

Diet  Type of diet: REGULAR,NO ADDED SALT
Diet information provided on DC:

Follow-Up Visit
Have you had a PAP smear in the last year? N  PRESS (F5)
If no, would you like to be referred to a physician at D/C? N  PRESS (F5)
======== If yes, post discharge appointment or referral must be made ========
              Date:            Appt with:
       Call Doctor's Office for appointment or any questions you might have.
For Out-Patient Appts, Please Call Central Wide Scheduling
Office at 1-888-624-1850.
Appointment comment:

Discharge comment:
PATIENT IS GOING TO FOLLOW UP AT FANTUS MENTAL HEALTH CLINIC AT 1901 WEST
HARRISON ST.CHICAGO,ILLINOIS
TEL-312-864-6178
OR ====                                                Next pg <Enter>
PATIENT CAN GO TO ENGLEWOOD MENTAL HEALTH CLINIC AT 641-WEST 63RD ST.
CHICAGO,.ILLINOIS
PHONE=312=747=7496
     I have received a copy of this form and understand the above instructions.
                                                              Date 10/27/14
Patient Signature and/or Relative/Friend/Guardian
RN's Signature
Physician's Signature
Thank you for choosing Norwegian American Hospital as your healthcare provider.
We are committed to providing you with the best healthcare possible.
You may receive a Patient Satisfaction Survey in the mail asking you to evaluate the care
you received during your hospital stay.
If you received a survey please take a moment to complete and return it.
Your feedback is very important to us and will help us to continue to improve the care we
```

```
RUN DATE: 10/27/14      Norwegian American Hosp Nursing **LIVE**        PAGE 3
RUN TIME: 1201              PATIENT INTERVENTION ACTIVITY
RUN USER: 0
```

```
Patient: ROGERS,CLARENCE                        Age/Sex: 51 M
Account #: N020299426                           Unit #: M507138
Admit Date: 10/19/14                            Location: 3D
Status: ADM IN                                  Room/Bed: 376-01
Attending: Patel MD,Shephali
```

provide.
Again, thank you for choosing Norwegian American Hospital.
Gracias por darnos la oportunidad de servirle. Norwegian American Hospital se compromete
en proveerle el mejor cuidado de salud posible. Puede que reciba una encuesta por correo
pidiendole que evalue el cuidado y los servicios que recibio durante su estadia
en el hospital. Si recibe una encuesta, por favor tome unos minutos de su tiempo para
completaria e enviarla por correo. Su opinion es muy importante para nosotros y nos
ayudara a poder continuar mejorando nuestros servicios. Una vez mas, gracias por escoger a
Norwegian American Hospital para el cuidado de su salud.

|  | Date | Time | By Monogram | Initials | Name | Nurse Type |
|---|---|---|---|---|---|---|
| Occurred: | 10/27/14 | 1153 | JBT | NUR.JBT | Toledo RN,Jovita B | RN BH |
| Recorded: | 10/27/14 | 1201 | JBT | NUR.JBT | Toledo RN,Jovita B | RN BH |
| Recorded at terminal: D368-03W.3 | | | | | | |



NORWEGIAN AMERICAN
HOSPITAL
"...Committed to your health"

**Continuing Care Plan**

ROGERS, CLARENCE
N020299426 M507138  09/18/63
Patel MD, Shephali 51M



Discharge Date: 10·27·14

*Social Services to complete this section:*

| | |
|---|---|
| **Principal Diagnosis** | Depressive Disorder |
| **Reason For Hospitalization:** | Depression |

**Discharge Plan:**

option 1

Fantus Mental Health Clinic
1901 W. Harrison St.
Chicago, IL 60612 , (hours: Mon-Sat 7am-5pm)
(P) 312. 864. 6178 (F) 312. 864. 7007

option 2

Englewood Mental Health Clinic
641 W. 63rd St.
Chicago, IL 60621
(P) 312. 747. 7496 (hours: Mon-Fri 9am-5pm)
(F) 312. 747. 3674

| | | |
|---|---|---|
| Signature of Social Worker: *[signature]* | Date: | 10.27.14 |
| Printed name of Social Worker: Sarah C. | Time: | 0955 |

**Next Level of Care** (name of institution or care provider):

Fantus Mental Health Clinic  OR  Englewood Mental Health Clinic

| | |
|---|---|
| Phone number: See above | Fax Number: See above |
| Notes: | |

*Nursing to complete this section:*

| Medications, Doses, and Instructions: | Indication(s): |
|---|---|
| Prozac 20mg. by mouth every day | → for depression |
| Seroquel 200mg. by mouth at bedtime | → ( mood stabilizer |
| Seroquel 100 by mouth every morning | ) |

This patient has been discharged with multiple anti-psychotic medications:  ☐ YES  ☒ NO
(if yes, notify patient's psychiatrist)

Contacted psychiatrist and documented rationale for multiple antipsychotic medications:  ☐ YES  ☐ NO

| | | |
|---|---|---|
| Signature of RN *[signature]* Jutta Toledo RN | Date: | 10/27/14 |
| Printed name of RN Jovita Toledo | Time: | 1150 |
| Patient Name: Clarence Rogers | Patient Signature: *Clarence Rogers* | |

| | | |
|---|---|---|
| Date sent: | Signature of staff member: | |
| ☐ by fax | | |
| ☐ other: | Printed name of staff member: | |

## Thresholds

### Note1

| | | | | | |
|---|---|---|---|---|---|
| **Client Name:** | Clarence Rogers | **Client ID:** | 65943 | **Status:** | Show |
| **Clinician Name:** | Grant Barlow | **Service:** | Comm Support Ind | | |
| **Date Of Service:** | 10/27/2014 | **Start Time:** 2:40 PM | **End Time:** 3:20 PM | **Duration:** | 40 Minutes |
| **Team:** | NCI Outreach Engagement 1 | | | | |
| **Location:** | General Hospital/Detox/Emergency Room | **Specific Location:** | Norwegian American Hospital | | |
| **Mode of Delivery:** | Face-to-face | **Member Participated:** | Yes | | |
| **Second Staff:** | | | | | |

**Other Participants:**

| Family Member(s) | Internal Collateral | External Collateral |
|---|---|---|

### Tracks/EBPs Utilized During the Session

DBT    WMR    IIMR    Job Finding    HMIS

### Care Plan Objectives Addressed by this Service

### Intervention/Progress

Staff intervention description:

Mental Health Need: Member's discharge plan had changed multiple times since his initial linkage with NCI team, as his PRG was misinformed regarding his housing placement. Community support services werre provided to update member regarding where he would be discharged to and to establish with member a list of goals/immediate needs to be addressed once back in the community.

Staff clarified with member his new plan to be discharged to Mother's House. Staff reviewed with member what documents he currently had (Identification, Link Card, and Social Security Card). Established member's short term goals were, primarily of which member reports wanting to locate an old word processor so that he can begin writing his books.

Member's response to interventions, progress toward objective(s) and plan:

Response to Intervention: Member was grateful that he was going to be established at Mother's House on the North Side, as he indicated that he would rather be linked to NCI care since he knew their "faces" now as opposed to southside, whom he hasn't met. Member expressed his gratitude both to his hospital social worker and staff for "going to bat" for him and assisting him in linkage to Mother's home.

Progress: Progress AEB successfully planning for member to discharge to Mother's Home. Progress AEB successful discharge out of Norwegian into the community.

| | | |
|---|---|---|
| **Clinician:** | Grant Barlow , QMHP | **Signature Date :** 10/29/2014 |

## Thresholds

### Note1

| | | | | | |
|---|---|---|---|---|---|
| **Client Name:** | Clarence Rogers | **Client ID:** | 65943 | **Status:** | Show |
| **Clinician Name:** | Grant Barlow | **Service:** | Comm Support Ind | | |

**Date Of Service:** 10/27/2014  **Start Time:** 2:20 PM  **End Time:** 2:40 PM  **Duration:** 20 Minutes

**Team:** NCI Outreach Engagement 1

**Location:** Public Place  **Specific Location:** Car, Franciso and Division.

**Mode of Delivery:** Telephone  **Member Participated:** No

**Second Staff:**

**Other Participants:**

| Family Member(s) | Internal Collateral | External Collateral |
|---|---|---|

### Tracks/EBPs Utilized During the Session

DBT  WMR  IIMR  Job Finding  HMIS

### Care Plan Objectives Addressed by this Service

### Intervention/Progress

Staff intervention description:

MHN: Member has nowehre to go upon discharge (miscommunciation between PRG and Printins House) and exhibits signs of depression (suicidal ideation, hopelessness) when homeless. Additionally, member cannot be acceptaed into many shelters due to his current active probation. Community support services provided to link member to mother's house, as his previous placement (Printis Place) reported having no room for him.

Staff collaborated with PRG case manager and informed her that Printis had informed him regarding the lack of available bed. Staff and PRG established a new plan for member to be transported to Mother's House, at 904 North Saint Louis.

Member's response to interventions, progress toward objective(s) and plan:

Response to Interventions: Member was not present for intervention, as this was primarily coordination and advocacy work.

Progress: Progress AEB member successfully placed at Mother's House.

Plan: Member will be discharged and staff will link him to Mother's House.

**Clinician:**  Grant Barlow , QMHP  **Signature Date :**  10/29/2014

No information found

**Tracks/EBPs Utilized During the Session**

DBT    WMR    IIMR    Job Finding    HMIS

**Care Plan Objectives Addressed by this Service**

**Staff Intervention**

Staff intervention description:*

Mental Health Need: Member was recently linked to housing by his PRG, which was significantly concerning and distressing for him because of a bed bug infestation for which he had to get hospitalized for (per member report).  Pre-Intake CM services provided to coordinate a housin gplacement between member's paroll officer a a placement.

Staff collaborated with paroll officer regarding the placement of member upon his discharge, set for Monday October 27th.  Staff advocated for member to be linked to Safe Haven (Paroll officer reported that she never gave referrals and that she could contact PRG to have member placed elsewehre.  Staff and paroll officer linked member to Printis House on West 112th place for his Monday discharge..

**Clinician:**     Grant Barlow , QMHP                 **Signature Date :**   10/28/2014

No information found

**Tracks/EBPs Utilized During the Session**

 DBT    WMR    IIMR    Job Finding    HMIS

**Care Plan Objectives Addressed by this Service**

**Staff Intervention**

Staff intervention description:*

Mental Health Need: Member was concerned about being where his long-term housing was going to be, as he had recently been kicked out of his paroll placement, had been denied ability to live with one of his sons (due to animal restrictions), and could not receive a paroll recommendation for a safe haven.  Pre-Intake CM services provided to link member with Printis House, on West 112th street, for his anticipated Monday discharge.

reviewed member's options to go to his friend's house to to be placed on the south side with Printis (where his PRG linked him to earlier in the day).  Staff and member called Printis to arrange for his Monday discharge and were informed that they had no available beds for member.  Staff and member followed up with PRG regarding member's inability to be admitted to Printis.  Staff, member, and PRG established that member had indeed been placed at Printis on 112th and that the house should have a bed available fo rhim by Monday.  Staff recommended that member begin working on his RTA and CHA application as soon as he is discharged.  Staff and member planned for his Monday discharge and his likely linkage to southside community support team.

**Clinician:**       Grant Barlow , QMHP                    **Signature Date :**   10/28/2014

## Thresholds
### Note2

| | | | | | |
|---|---|---|---|---|---|
| **Client Name:** | Clarence Rogers | **Client ID:** | 65943 | **Status:** | Show |
| **Clinician Name:** | Grant Barlow | **Service:** | Pre-Intke Linkage CM | | |
| **Date Of Service:** | 10/24/2014 | **Start Time:** 2:05 PM | **End Time:** 3:40 PM | **Duration:** | 95 Minutes |
| **Team:** | NCI Outreach Engagement 1 | | | | |

**Location:** General Hospital/Detox/Emergency Room **Specific Location:** Norwegian Americna Hospital

**Mode of Delivery:** Face-to-face **Member Participated:** Yes

**Second Staff:**

**Other Participants:**

| Family Member(s) | Internal Collateral | External Collateral |
|---|---|---|

**Information**

**Current Life Events**

Homelessness: 09/23/2014 - Current

**Current Diagnosis**

Axis I - Primary: 296.80 - ( Bipolar Disorder NOS )

Axis I - Additional: 311 - ( Depressive Disorder NOS )

Axis I - Additional: 292.9 - ( Amphetamine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Caffeine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Cannabis-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Cocaine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Hallucinogen-Related Disorder NOS )

Axis I - Additional: 292.9 - ( inhalant-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Nicotine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Opioid-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Other (or Unknown) Substance—Related Disorder NOS )

Axis I - Additional: 292.9 - ( Phencydlidine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Sedative-, Hypnotic-, or Anxiolvtic-Related Disorder NOS )

Axis II - Additional: 799.9 - ( Diagnosis Deferred on Axis II )

Axis II - Additional: 799.9 - ( Diagnosis or Condition Deferred on Axis I )

Axis III - HIGH - ( High Blood Pressure (Hypertension) )

Axis III - GLAU - ( Glaucoma )

Axis III - OTHE - ( Med Condition seriously impacting member health )

Axis IV - Occupational, Housing, Economic, Legal, Member is unemployed, member is homeless, member has a legal history and is currently on parole, member has limited financial resources

Axis V - 45

**IDDT Stage of Treatment**

## Thresholds
### Note2

| | | | |
|---|---|---|---|
| **Client Name:** | Clarence Rogers | **Client ID:** 65943 | **Status:** Show |

**Clinician Name:** Grant Barlow    **Service:** Pre-Intke Linkage CM

**Date Of Service:** 10/24/2014    **Start Time:** 11:10 AM    **End Time:** 11:30 AM    **Duration:** 20 Minutes

**Team:** NCI Outreach Engagement 1

**Location:** Other    **Specific Location:** Car, Outside of Continental Nursing Home

**Mode of Delivery:** Telephone    **Member Participated:** No

**Second Staff:**

**Other Participants:**

Family Member(s)    Internal Collateral    External Collateral

## Information

## Current Life Events

Homelessness: 09/23/2014 - Current

## Current Diagnosis

Axis I - Primary: 296.80 - ( Bipolar Disorder NOS )

Axis I - Additional: 311 - ( Depressive Disorder NOS )

Axis I - Additional: 292.9 - ( Amphetamine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Caffeine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Cannabis-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Cocaine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Hallucinogen-Related Disorder NOS )

Axis I - Additional: 292.9 - ( inhalant-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Nicotine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Opioid-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Other (or Unknown) Substance—Related Disorder NOS )

Axis I - Additional: 292.9 - ( Phencydlidine-Related Disorder NOS )

Axis I - Additional: 292.9 - ( Sedative-, Hypnotic-, or Anxiolvtic-Related Disorder NOS )

Axis II - Additional: 799.9 - ( Diagnosis Deferred on Axis II )

Axis II - Additional: 799.9 - ( Diagnosis or Condition Deferred on Axis I )

Axis III - HIGH - ( High Blood Pressure (Hypertension) )

Axis III - GLAU - ( Glaucoma )

Axis III - OTHE - ( Med Condition seriously impacting member health )

Axis IV - Occupational, Housing, Economic, Legal, Member is unemployed, member is homeless, member has a legal history and is currently on parole, member has limited financial resources

Axis V - 45

## IDDT Stage of Treatment